SAM BARONE *ET AL.*, PLAINTIFFS-APPELLANTS, v. TOWN-
SHIP OF BRIDGEWATER, A MUNICIPAL CORPORATION
OF THE STATE OF NEW JERSEY, DEFENDANT-RE-
SPONDENT.

Argued March 15, 1965—Decided July 6, 1965.

Mr. *Mark L. Stanton* argued the cause for plaintiffs-appellants (*Messrs. Doren & Stanton,* attorneys; *Mr. Stanton,* of counsel; *Mr. Raymond P. DeMarco,* on the brief).

Mr. *Charles A. Reid, Jr.* argued the cause for defendant-respondent.

The opinion of the court was delivered by

HALL, J. ▮ This is a highway zoning case. The locale fronts the same road—U. S. Highway Route 22—as that involved in *Wilson v. Borough of Mountainside,* 42 *N. J.* 426 (1964), but some 12 miles farther west in Bridgewater Township, Somerset County. The suit attacks the residential-agricultural use classification of the most easterly half mile

of the highway frontage in the township running from the Green Brook Township boundary west to the Mountain Avenue overpass intersection. The classification was imposed by the township's original ordinance in 1937 and continued in essence by the comprehensive revision thereof adopted in 1962. Plaintiffs are some, but not all, of the abutting property owners in the strip on both sides of the highway. The trial court found the zoning unreasonable as applied to plaintiffs' lands. The Appellate Division reversed in an unreported opinion. We granted certification on the plaintiffs' application. 43 *N. J.* 357 (1964). The basic issue, as is usual in this type of case, is whether the challengers have sustained their rather heavy burden of demonstrating that the municipal ordinance classification is so far without reason and arbitrary as to require invalidation.

Since the complaint is exceedingly sketchy and the pretrial order no more informative, plaintiffs' thesis has to be gathered from their proofs and argument. Although the testimony of some of the plaintiffs themselves is not entirely consistent with the theory advanced by their counsel and expert witnesses, it is plain enough that the case was presented below and is argued here primarily on the contention that the impact of this busy highway on abutting lands in the area in question, in and of itself and essentially without regard to other considerations, requires such lands, to a depth of at least 400 or 500 feet, to be zoned for commercial and industrial uses. Plaintiffs' counsel at the trial spoke of their aim as "to open it wide open for business." Indeed, if plaintiffs' theory were to be accepted, it is difficult to imagine lands anywhere fronting on such a road which would not have to be so zoned—a conclusion we are not prepared to accept as an abstract proposition. Rather the land use regulation of such properties should be determined by consideration of a congery of the particular historical, geographical and economic facts in each instance.

The trial judge professed not to rely on such a broad approach, mentioning some business uses present in the area

and nearby, the general lack of development of the affected lands over the years and his opinion that "the possibility of sale to anyone desiring residential property" was "extremely remote," despite substantial municipal testimony tending oppositely. Nonetheless, the wider thesis is not entirely absent from his conclusions, as witness the emphasis placed on "the devotion of land to its most appropriate use and the general character of the district and its peculiar suitability for a particular use."

The Appellate Division, in reversing, dealt with the matter in a very general fashion, relying mainly on the presumption of validity. Despite the involvements of the case, there was little discussion of the facts or the various considerations to be taken into account. The court simply concluded "* * * that there is at least a debatable question that the ordinance in dispute is in accord with the comprehensive plan for the orderly development of land uses within Bridgewater Township * * *." Although *Wilson v. Borough of Mountainside, supra*, 42 *N. J.* 426, was decided before this cause was argued in the Appellate Division, it is not cited nor is the opinion's conclusion considered in the light of our holding in *Wilson* concerning the relationship between a comprehensive municipal zoning plan and the ordinance use classification of a particular area. It was there said: "* * * it is elementary that every district use classification is not saved simply because it is part of a comprehensive community plan. The plan to be a valid and effective influence in support of zoning regulations must not be a capricious one and its existence will generally not *ipso facto* insulate from scrutiny or invalidity the use classification of a substantial area which is established to be realistically unreasonable." 42 *N. J.*, at *p.* 449. In view of the Appellate Division's manner of treatment, we feel obligated to review the factual and other considerations more fully than generally is the case when we are passing upon a determination of that tribunal in a zoning controversy. *Cf. Tidewater Oil Co. v. Mayor and Council of Carteret*, 44 *N. J.* 338, 344–345 (1965).

In *Wilson,* we described in some detail Route 22, its traffic load, and the present state of the almost solid commercial and industrial development of every kind and description along its frontage west from the intersection with U. S. Route 1 near Newark Airport. 42 *N. J.,* at *pp.* 434–435. That description need not be repeated here. The important thing is that the intense concentration of such roadside uses rather abruptly stops at the Green Brook Township—Bridgewater Township line, the easterly end of the area here in question. While the volume and nature of the traffic continues westward for several miles further, the break in abutting uses is obvious to the observer. From this point on for the eight or nine miles of the course of Route 22 through Bridgewater, highway development has not been extensive or cluttered except for a relatively short distance in the general area where the road adjoins the Borough of Somerville and other through highway routes intersect, in which section a regional business zone of considerable size was provided by the 1962 ordinance. The reason for the difference between Bridgewater and communities to the east is historical.

Route 22, originally known as State Highway 29, was built through the eastern half of Bridgewater Township about 1930. It ran a virgin course north of the settled sections, through vacant, essentially rural, land. Although there was no township zoning until 1937, only a few business structures were erected along it in the early years. The first zoning ordinance (1937), we are advised, placed the whole area through which the road passed in a residential-agricultural zone. Whether that classification was and remained justified for every foot of township highway frontage is beside the point. The fact would appear to be that the township authorities then, with some vision, decided to prevent the highway blight which, as related in *Wilson,* has since descended upon the municipalities to the east adopting the opposite policy of encouraging or tolerating beyond redemption highway commercial and industrial development by one means or another, and to seek to maintain the highway for its true function of

transportation of people and goods rather than as a "Main Street" as well. To be particularly stressed is that Bridgewater's highway zoning was not appreciably broken down by the granting of indiscriminate variances or other devices. Few variances were allowed and, while until about the time of the 1962 revision there was no great amount of residential building along the highway, most nonresidential uses preexisted the 1937 ordinance and were nonconforming. The appearance throughout was definitely one of open spaces and lack of development rather than the contrary.

This status has been especially true of that segment running westerly from the Green Brook line to the Thompson Avenue overpass intersection, which is a mile and a half or so west of Mountain Avenue. In describing the segment, note should be made of the topography. For several miles east of Mountain Avenue, the highway runs just south of the base of the first range of the Watchung Mountains. This is the situation in the area from the Green Brook boundary to Mountain Avenue specifically involved in this case. On the north side of the highway the land is generally quite level to a depth of 400 feet or so and then rises rather sharply up the mountain side. On the south side, the terrain is flat for an almost infinite distance. From Mountain Avenue to Thompson Avenue, the mountain juts out and the highway cuts through the lower slope. (West of Thompson Avenue, it continues straight while the mountain angles to the northwest some distance away from it, making for a wide expanse of level land for several miles.)

Looking first at the Mountain Avenue—Thompson Avenue portion of this segment, which adjoins the area in question directly on the west, the Borough of Bound Brook breaks into Bridgewater Township for a distance of about a half mile west from Mountain Avenue, extending beyond the north side of the highway about 600 feet. The borough zoning is residential on both sides of the highway. A number of expensive residences are located within the 600 foot strip on the north side, many of the rear yards of which are not far distant

therefrom. As was disclosed at oral argument, a substantial housing development is now in process on the south side, with the rear of a number of houses within 100 feet or so of the right of way. Bridgewater Township then resumes on both sides of the highway. On the north side there are some older homes fronting thereon and on the south side two high grade housing developments have recently been constructed with the rear of many of the houses within a few feet of the highway. There are only four commercial uses in this one and one-half mile stretch, all nonconforming. Three are at the Thompson Avenue intersection and one (a tavern) at the road intersection next easterly, directly adjoining one of the housing developments mentioned. The township residential zoning, which, as has been indicated, starts at the Green Brook boundary, continues as far as the Thompson Avenue intersection.[1]

Turning specifically to the Green Brook—Mountain Avenue section with which we are directly concerned, on the north side there are 11 land owners, only five of whom are plaintiffs, holding plots of varying shapes and sizes ranging from a sliver to substantial acreage. There was obviously no planned plot layout when the various parcels were sold off after the highway was cut through. They vary in frontage from 100 feet to more than 500 feet and in depth from about 250 feet to 800 feet or more. There are five houses fronting on the

---

[1] The township highway area west of Thompson Avenue was rezoned by the 1962 revision. As previously noted, the topography is vastly different and there had been practically no residential development over the years. Interstate Route 287, very recently constructed, crosses and parallels Route 22 for some distance in this area. The revised zoning places it, as far as Somerville, in limited industrial, limited industrial and commercial, and a special quarrying classifications, requiring respectively, five-acre, ten-acre and 100 acre minimum lot sizes, with substantial additional restrictions to prevent intensive and cluttered development. This area is so different from that east of Thompson Avenue that it cannot be conceived to have any bearing on the appropriateness of the use classification of the section involved in this case. Indeed Bridgewater Township is so vast and sectionally heterogeneous in its characteristics and present and potential land uses that it is difficult to think of a single, over-all zoning or planning objective for the entire municipality.

highway (one unoccupied), four of the owners of which are not plaintiffs. The fifth is owned by a party who operates an adjoining florist shop and large greenhouses several hundred feet to the rear. Aside from this highway business use, there are a substantial nursery (a permitted use), the owner of which also owns a 100-foot lot on the south side where he maintains an office and sales building, a gasoline service station, and a hamburger and hot dog restaurant with which a gold fish and skating pond is also operated. The owner of this latter enterprise purchased the highway frontage on which the parcel is located only a few years ago and also, within the past couple of years, erected a substantial home on the rear portion of his property about 350 feet north of the highway. There is another good-sized home of fairly recent vintage on an adjoining rear plot whose owner is also not a plaintiff. The only parcel of vacant land on this side is that at the Mountain Avenue intersection, substantially reduced as to Route 22 frontage by recent state acquisition for the overpass and approaches. See condemnation litigation in connection therewith reported as *State by State Highway Com'r v. Speare*, 86 *N. J. Super.* 565 (*App. Div.* 1965). The remaining land acreage now fronts principally and for more than 1000 feet on Mountain Avenue, an entirely high quality residential road slanting up the mountain. The business uses described all antedated the 1937 ordinance and the houses fronting the highway were certainly built not later than 1947. The service station and the hamburger restaurant have been the beneficiaries of variances to permit some modernization. Both of these owners testified that their interest in seeking to invalidate the present zoning is to permit enlargement of the service station and a change in the nature of the retail business conducted at the restaurant site (both of which could be appropriate subjects for further variance applications.)

In some contrast, the land in the area on the south side of the highway is level and substantially vacant. There are seven owners. Going east from Mountain Avenue, there is a vacant strip about 250 feet deep and perhaps 1000 feet long

which adjoins the large Thomae Park residential development, the houses in which are built up quite close to the strip. The owner is not a plaintiff. Next comes a golf driving range, a nonconforming use, on a plot some 800 feet deep with over 500 feet of highway frontage. The owner, who has erected a large home on the rear of the property, is a plaintiff but did not testify. This parcel adjoins a vacant tract of 20 acres or more, the owner of which is not a party. Then there are two triangular tracts of a bit over an acre each. One contains the remains of a long abandoned diner, the owner of which is a plaintiff, placed there just before the 1937 ordinance was adopted. A prospective purchaser sought to invalidate the original residential zoning in 1938 in order to erect a service station and bunkhouse. The effort was unsuccessful. *Vogel v. Board of Adjustment,* 121 *N. J. L.* 236 (*Sup. Ct.* 1938). There is an old house on the second of these parcels. The owner is a plaintiff but did not testify. The final piece on this side, except for the nurseryman's 100-foot lot, is another parcel of very considerable acreage, vacant except for the shell of a house commenced in 1950 but never completed. The owner is not a party and there was nothing but unreliable hearsay offered as to the reason for its present status.

To recapitulate, there are 17 parcels in separate ownership in the whole area in question. Only eight of the owners are plaintiffs, and of those, but four testified. There are six houses fronting the highway; just two of the owners are parties. There are but five commercial uses, including the nursery and driving range which are better characterized as land uses since they do not involve permanent structures of any size. Only three of these commercial occupants testified and two were concerned solely with enlargement or change of business use in their present enterprises. Only three of the landowners who may be said to own any substantial amount of vacant land joined the suit. Their holdings probably do not equal even half of the unimproved land available in the section. While this relative paucity of interest in the litigation without explanation is probably of no great legal

moment, it is some indication, in view of the fact that the attack is on the basis that the whole area is malzoned, that the present zoning regulations are not thought to be onerous by many of the affected landowners.

Plaintiffs emphasize the relative lack of development in the area over the years as conclusively indicating the unreasonableness of the zoning limitation to residential and agricultural uses. Their lay and expert testimony was directed to a claim of confiscation because commercial use is prohibited and people will not build residences fronting on the highway nor will lending institutions place mortgages thereon. The evidence does not support the claimed conclusion. While the south side of the highway remains substantially vacant, there are only two vacant parcels of any size on the north side, even counting the nursery as one. While three of the four owners who testified stated that they had received no inquiries relating to acquisition of their properties for residential purposes but that some overtures over the years had been made to them by persons interested in possible retail business and motel ventures, there was no testimony that any owner had actually tried to sell his property and had been unable to find a buyer because of the zoning restrictions. The fourth lay witness, the gas station operator, appeared not interested in disposing of his property.

Why particular land in a certain municipality does not develop in accordance with a zoning plan may be due to any number of conceivable reasons, most of which have little or no bearing on the validity of the zoning classification. Contentment of the present ownership, holding of land for speculative advancement in value in hopes of a zone change, and abundance of other land similarly classified and presently more desirable are among such conceivable reasons. Plaintiffs' planning expert conceded that the mere fact residentially zoned land had not developed does not justify placing it in another use classification, absent other reasons. The language of Justice Case in *Vogel, supra* (121 *N. J. L.*, at *p.* 238), in 1938, where invalidation of the residential classification on

the south side diner property was refused and the denial of a variance for a further business affirmed, still has some pertinency despite the changing years:

"Of necessity there are border areas where the reason[s] for restrictions are not so apparent because it is inevitable that zones of varying degrees of restriction must abut and that restricted lands in proximity to unrestricted lands will be in a somewhat prejudiced position. But that is a consequence upon the exercise of the constitutional authority. Also, it is clear that every foot of land in a zone restricted to residences may not be so located that an attractive residence can advantageously be erected thereon. But if the act of a municipality in zoning is to be anything more than a gesture, the determination of the zoning board thereon should, in the absence of palpable abuse of discretion, be honored."

█ █ A local realtor, the other of plaintiffs' opinion witnesses, with no qualifications as a zoning expert, stressed the highest and best use of the area property as commercial and industrial, but that is no weighty factor in zoning classification determination. If it were, the whole concept of uniform zoning by districts in implementation of the statutory purpose (*N. J. S. A.* 40:55–32) to encourage the most appropriate use of land *throughout the municipality* would have to fall. Both witnesses mentioned that housing development of the area would require large tracts and stressed the difficulty of assembly of the present parcels into single ownership for such purposes. They agreed, however, that modern highway commercial or industrial uses also require similar large tracts for practical reasons and because of lot size and other regulations for such uses found in current municipal ordinances. It would seem indisputable that any commercial or industrial development with direct highway access would generate more highway traffic and additional hazards than residential development, especially if the latter backed upon rather than fronted the highway and access was from side roads only. Both experts agreed that structural and other uses in the area to date had not gone so far as to preclude either residential or business development. While the varying size and shape of present parcels would present some difficulties in any type of

extensive development, it is well to keep in mind in this connection the testimony of plaintiffs' planner that "* * * zoning doesn't look to the nature of the ownership. It looks, among other things, to the ownership and available land." From the standpoint of the determination of appropriate zoning of a particular sector by the preponderance of actual uses therein, the physical facts support the township's testimony that the nature and extent of current uses does not in itself dictate either commercial or residential classification, rather than plaintiffs' asserted conclusion that business uses predominate and zoning of that character is therefore required.

Plaintiffs further urge that commercial use zoning of the strip in question is dictated by the intense concentration of highway business and industrial enterprises permitted and existing throughout the Green Brook Township frontage to the east. The argument is that Bridgewater must take into account and, indeed, be controlled by the character and volume of the uses in the adjoining municipality. See *Borough of Cresskill v. Borough of Dumont*, 15 *N. J.* 238 (1954). The point is not a sound one in the factual context at hand. The rationale of *Cresskill* is that a neighboring community must consider, in its own zoning, *adverse* effects thereof on its neighbor. It would certainly be a perversion to twist this salutary concept to require a municipality to zone its highway frontage so that all of the detrimental effects its neighbors have brought about will be duplicated within its borders in spite of its long continued effort to prevent that very consequence.

The township offered several bases in support of the reasonableness of its decision to retain this area, along with the section as far west as Thompson Avenue, in the residential-agricultural classification in the 1962 comprehensive ordinance revision. Its witness was the planning consultant who made the studies and recommendations to the township authorities which ultimately resulted in that enactment. While some of the reasons are of doubtful strength and need not be

discussed, the principal consideration advanced—and the factor which we believe to be decisive—was that these lands are sufficiently adaptable for and physically capable of residential development as to warrant classification for that use. This conclusion is grounded, first, in the fact that in very recent years successful and attractive residential developments have grown up along Route 22 frontage. This has been accomplished by backing the closest houses to the highway sideline rather than fronting them on it and providing access by side roads rather than directly from the highway. The three projects of this character very close to these lands on the south side of the highway in Bound Brook and Bridgewater west of Mountain Avenue, as well as the large Thomae Park development within 300 feet of the highway and adjoining the golf driving range on the southwest, furnish ample proof. We noted the same type of development farther east in *Wilson v. Borough of Mountainside, supra,* 42 *N. J.* 426, and comment was made at oral argument of the very extensive garden apartment construction on the mountainside in North Plainfield. *Secondly,* the municipality demonstrated by actual plans presented at the trial that such development is physically feasible here. On the south side, the land can be laid out as an extension of the Thomae Park section, utilizing the full highway frontage. In fact, a road connection for this purpose is included in the Thomae Park layout. On the north side, the area to the rear of the approximate 300-foot depth of most of the present uses, may be similarly planned with access provided from Mountain Avenue.

While plaintiffs' experts disputed such a prospective utilization in a general fashion, we think it is evident that the township's proofs in this regard may not be cast aside and, when viewed with plaintiffs' evidence, are sufficient to require a court to say, in fulfillment of its appropriate role in reviewing a municipal zoning ordinance provision, that a debatable question, at least, of the reasonableness of the local legislative action thereby results. Under elementary principles therefore, the ultimate conclusion necessarily is that the attacking party

has not sustained his burden and the ordinance provision must be sustained.[2]

The judgment of the Appellate Division is affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

---

[2] Plaintiffs also argued that if their lands were properly zoned for residential uses, the specific regulations then applicable are unreasonable. The north side of the highway is in the R-50 (50,000-square-foot minimum lot size) zone and the south side in the R-20 zone (20,000 or 40,000-square-foot minimum lot size, depending on the availability of public water and sewer facilities). The question was not raised by the pretrial order and was not passed upon by the trial judge or the Appellate Division. We express no opinion on it either.