574 A.2d 38

LOU FERRARO AND HAZLET AUTO CLEAN, INC., A CORPORA-TION OF THE STATE OF NEW JERSEY, PLAINTIFFS-RE-SPONDENTS, v. THE ZONING BOARD OF ADJUSTMENT OF THE TOWNSHIP OF HOLMDEL, DEFENDANT, AND TOWN-SHIP OF HOLMDEL, INTERVENOR–APPELLANT.

Argued January 29, 1990—Decided May 29, 1990.

*Eugene A. Iadanza* argued the cause for appellant (*Tucci, Iadanza and Reisner,* attorneys; *Eugene A. Iadanza,* and *Shaun R. Schlich,* on the briefs).

*Ronald H. Gordon* argued the cause for respondents (*Kramer & Gordon,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

This case requires the Court to consider the effect of an agreement reached in 1962 between two contiguous municipalities. The agreement, authorized by joint resolutions, permits each municipality to exercise its power of taxation over certain

parcels of property that straddle the two municipalities. The agreement also authorizes each municipality to provide municipal services to those properties that it taxes. The issue posed is whether this agreement can be construed as including the power to zone.

## I.

Respondents, Lou Ferraro and Hazlet Auto Clean, Inc., own approximately 57,000 square feet of property that is divided by the line separating the Township of Holmdel from the Township of Hazlet: 39,700 square feet or 70% of the property lies in Hazlet, the remaining 30% lies in Holmdel. The Hazlet portion is within that Township's Business Highway Zone; the Holmdel portion is zoned for residential use only.

The property is currently vacant, and it is here that Ferraro desires to construct his car-wash business, Hazlet Auto Clean. The facility he proposes contains two components: an automated, full-service car wash, and an area with stalls for self-service car washing.

Because the Holmdel portion of the property is zoned residential, respondent Ferraro applied to the Zoning Board of Adjustment of the Township of Holmdel ("Board") for a use variance, pursuant to *N.J.S.A.* 40:55D-70(d). After four public hearings in 1987, the Board denied Ferraro's variance application. Ferraro appealed the Board's decision to the Law Division, contending that the variance denial was arbitrary and capricious. The trial court concluded that the Board lacked jurisdiction to rule on the variance because Holmdel had ceded its zoning authority to Hazlet under a 1962 joint resolution ("Resolution") between Holmdel and Hazlet.

The 1962 Resolution authorizes each municipality to exercise its power of taxation over particular properties located in both municipalities. The trial court determined that the Resolution embodied an agreement under which "Holmdel Township effectively relinquished all of their rights with respect to the thirty

percent of [Ferraro's] land [that lies within its boundaries] by allowing Hazlet to tax it." The court premised this delegation of authority, which, it determined, included the municipality's zoning power, on *N.J.S.A.* 40A:13–19, and –20. Those statutes provide that one municipality may grant the power of "sole supervision" over bordering land to another municipality.

On appeal, the Appellate Division noted, in a published opinion, 228 *N.J.Super.* 33, 548 *A.*2d 1139 (1988), that the statutory provisions relied on by the trial court were not enacted until 1979. It nevertheless reasoned that, in theory, the 1962 agreement could be interpreted in light of that statutory authority and thus could have transferred "sole authority" over the land to Hazlet, including the power to zone the Ferraro property. The Appellate Division remanded the case for a further factual determination of whether the parties intended by their 1962 agreement to divest Holmdel of its zoning jurisdiction over the property in question. We granted Holmdel's petition for certification. 114 *N.J.* 518, 555 *A.*2d 631 (1989).

## II.

In 1962, Holmdel and Hazlet (then called the Township of Raritan) adopted a joint resolution providing for the tax assessment of eleven lots that straddled the border between the two municipalities. The Resolution contained certain recitals:

WHEREAS, the boundary line between the taxing districts of the Township of Holmdel and the Township of Raritan divides certain lots or tracts of land, and

WHEREAS, it is deemed necessary and desirable to determine for assessment purposes the lots or tracts of lands to be assessed by the respective townships, and

WHEREAS, it has been agreed between the assessors of the respective townships that certain of the lots divided by the line between taxing districts should be assessed by the Township of Raritan and certain of the lots should be assessed by the Township of Holmdel, and

WHEREAS, it is agreed between the respective townships that municipal services should be rendered by the taxing district;

\*      \*      \*      \*      \*      \*      \*      \*

The Resolution then identified eleven parcels by block and lot number on the tax maps of each Township, and specified which

of these parcels were "to be assessed by Township of Raritan" and which "to be assessed by Township of Holmdel." Under the terms of the Resolution, the parcel constituting Ferraro's property is one designated "to be assessed by the Township of Raritan." The Resolution further provided that the underlying agreement would become effective on approval by the respective Townships. The Raritan Township Committee adopted the Resolution at a special meeting on August 24, 1962. The Township Committee of Holmdel adopted the same agreement on September 13, 1962. Hence, the portion of Ferraro's property that lies in Holmdel is currently taxed by Hazlet and has been since 1962.

█ It has been assumed by both lower courts and the parties that the operative statutory authority governing the validity and meaning of the inter-municipal agreement encompassed by the Resolution is that which enables adjacent municipalities to allocate between them the "sole supervision" of property that lies in both municipalities. The lower courts both looked to that statutory authority, *N.J.S.A.* 40A:13–19 and –20, and their predecessors, *N.J.S.A.* 40:43–72 and –73, as the operative enactments governing the meaning of the agreement. The current statutes were enacted in 1979. *N.J.S.A.* 40A:13–19 provides:

> When the boundary line between adjoining municipalities divides lands and buildings, so that a portion of the lands and buildings are located in each municipality, the municipalities in which the lands and buildings are situated may determine, by resolution passed by their respective governing bodies, which municipality shall have sole supervision of the lands and buildings.

*N.J.S.A.* 40A:13–20 explains what is meant by "sole supervision":

> The municipality assuming sole supervision of any lands or buildings mentioned in *N.J.S.A.* 40A:13–19 shall furnish them with the same services that are furnished to lands and buildings located wholly within its boundaries, and shall have sole power to issue all licenses and permits required for such lands or buildings.

The Appellate Division noted that the predecessor statutes, enacted in 1927 and in effect in 1962, *N.J.S.A.* 40:43–72 and –73,

parrot the language of the 1979 statutes. Consequently, it concluded that even though *N.J.S.A.* 40A:13–19 and –20 had not been enacted in 1962, and had "no direct application" to plaintiff's vacant lots, they could be invoked to determine the meaning of the inter-municipal agreement and specifically whether it contemplated the delegation of zoning authority. 228 *N.J.Super.* at 36, 548 *A.*2d 1139.

Although virtually identical to the current statutes, *N.J.S.A.* 40:43–72, –73 were different in one material aspect. They referred only to "buildings"; they did not purport to encompass bordering "lands." Nevertheless, the Appellate Division ruled that the 1962 resolution could be construed in light of the 1979 statutes, reasoning that the 1979 statutes, with their addition of the term "lands," could apply to the 1962 agreement because neither municipality took any action "after the passage of these statutes either to expand or retract the powers ceded or obligations undertaken under their earlier resolutions." *Ibid.* Thus, the Appellate Division reasoned that "it is a permissible determination that Townships have availed themselves of whatever powers are conferred by *N.J.S.A.* 40A:13–19 and –20 with respect to the property in question." *Id.* at 38, 548 *A.*2d 1139.

However, regardless of whether the earlier statutes impliedly covered "lands" as well as buildings, we see no evidence that the Resolution approved by the municipalities was adopted pursuant to *N.J.S.A.* 40:43–72 and –73, or that they "availed themselves" of any added powers conferred by the successor enactment, *N.J.S.A.* 40A:13–19 and –20. The Resolution does not by its terms express a mutual understanding to exchange "sole supervision" over particular vacant lands lying in both municipalities. The express language of the Resolution does not refer to "sole supervision." The Resolution deals almost exclusively with the power to tax. The only reference to a municipal responsibility other than taxation appears in one recital clause: that the taxing district *"should"* provide "municipal services" to the property being taxed by it.

Thus, there is no indication that the municipalities availed themselves of the statutory power to exchange "sole supervision" over properties through an agreement that refers only to an exchange of the taxing authority and, incidentally, the duty to render "municipal services" to such parcels. It does not appear that "municipal services," as a corollary obligation to the right to tax, can be equated with sole supervisory authority over the property in question. Moreover, while the Appellate Division believed that the municipalities could have "availed themselves" of the authority of the statutes passed in 1979 and that the 1962 agreement could thereby acquire content and meaning from the later enactment, which covered land as well as buildings, there is no extrinsic circumstance that suggests that the 1962 agreement, either when adopted or as it was implemented over the years, had to do with anything other than the taxation of the subject properties.

It is, rather, more reasonable to conclude that the Resolution was intended to address only the taxing authority of the municipalities. As noted, the Resolution nowhere indicates that it was adopted pursuant to *N.J.S.A.* 40:43–72 and –73. Significantly, the language—the terminology and vocabulary—of the Resolution neither mimics nor mirrors the language of *N.J.S.A.* 40:43–72 and –73. Rather, the Resolution employs the statutory phraseology of *N.J.S.A.* 54:4–25. That statute was originally enacted in 1918, *L.*1918, *c.* 236, and was in existence at the time the Resolution was adopted in 1962. It explicitly authorizes adjoining municipalities to agree that each can assess the entirety of a parcel lying in both municipalities.

When the line between taxing districts divides a tract of land, each part shall be assessed in the taxing district where located, unless the governing body of one of the taxing districts shall by resolution request that the entire tract be assessed by the adjoining taxing district in which a portion of the tract is located. [*N.J.S.A.* 54:4–25.]

That is precisely what the 1962 agreement does.

The wording of the Resolution strongly suggests that the governing bodies of Holmdel and Hazlet looked to *N.J.S.A.*

54:4–25 when they drafted the Resolution. Both the statute and the Resolution are concerned with the mechanics of two municipalities agreeing on tax assessment of properties that border both localities; both use the phrase "taxing district"; both speak of the "line between the taxing districts" and of the line that "divides [certain] tract[s] of land"; both speak of a "resolution" to effectuate the agreement to assess. The inference is exceedingly strong that the municipalities reached their agreement under the authority of *N.J.S.A.* 54:4–25. We are thus satisfied by both the obvious language and the content of the Resolution, in light of *N.J.S.A.* 54:4–25, that its intended effect was to transfer the right to collect taxes from the parcels delineated, not to transfer sole supervisory power, inclusive of the zoning powers, to the municipality authorized to tax the parcels involved.

There is, however, an antecedent issue, the determination of which is dispositive of the intended effect of the Resolution. The Appellate Division stated: "we extrapolate from these conclusions [that *N.J.S.A.* 40A:13–19 and –20 apply to the Resolution] that since the 'sole supervision of the lands' is also transferred, any variance application should be heard by the board of adjustment of the community in which such supervisory power is transferred." 228 *N.J.Super.* at 38, 548 *A.*2d 1139. The Appellate Division believed that sole supervisory power over property included the zoning power, including the power to zone property in the adjacent municipality, *id.* at 39, 548 *A.*2d 1139, or, absent exercise of the power to zone, the power to grant variances from the provisions of the existing ordinance. *Ibid.* The court reasoned that the authority delegated for "sole supervision" of property specifically includes the "sole power to issue all licenses and permits" under *N.J. S.A.* 40A:13–20, and that a variance is in essence a "permit" to use property in a non-conforming way; hence, Holmdel ceded its authority to grant variances over the property at issue. *Ibid.*

Assuming that the Resolution intended to effectuate a transfer of sole supervisory authority over property under *N.J.S.A.* 40A:13–19, the statute itself, *N.J.S.A.* 40A:12–20, refers to the power to grant "permits and licenses" as being included within that authority. It does not otherwise define what is meant by a "permit" or a "license." We are unpersuaded that this language encompasses the power to zone or grant a variance under the Municipal Land Use Law, *N.J.S.A.* 40:55D–70, or that the Legislature reasonably intended that a license or permit in the context of municipal supervisory power of lands was intended to include the zoning power. The imputation of such a special meaning is not obvious from the common usage and the ordinary understanding to be ascribed to these terms. A permit is "a written license or warrant, issued by a person or authority, empowering the grantee to do some act not forbidden by law, but not allowable without such authority," *Black's Law Dictionary* (revised 5th ed.) (1983). A license is "a certificate or the document itself which gives permission." *Ibid.* Although zoning ordinances and variances literally are legal authorization for the particular use of property, they arise in a highly elaborate, quasi-judicial procedural framework that is not typical of ordinary administrative licensure.

There are, moreover, other more cogent considerations militating against an equation between the zoning power and municipal licensing. It is significant that local zoning power had not even been created, no less delegated to municipalities, when *N.J.S.A.* 40:43–72 and –73 were enacted in 1927. *L.*1927, *c.* 183. When the power to zone was initially conceived, it was recognized as a subject of constitutional dimension. The zoning power was first adopted by special election on October 18, 1927, as the Zoning Amendment to the 1844 Constitution. *N.J. Const.* (1844) Art. 4, sec. 6, para. 5. By its terms, however, that constitutional provision did not become operative until enacted by the Legislature. That occurred when the first zoning statute was passed and approved on April 3, 1928. *L.* 1928, *c.* 274. The Zoning Amendment exists today as Article

4, section 6, paragraph 2 of the 1947 Constitution. Thus, it cannot be inferred that the Legislature, in enacting the municipal zoning power over land use pursuant to a popular constitutional mandate, contemplated that it could be transferred by inter-municipal agreement under preexisting statutes that referred essentially to "permits" and "licenses" as an incident to the sole supervisory authority over property, which authority municipalities could exchange by agreement.

The history of the local zoning power confirms its perceptions as a distinctive aspect of the municipal police powers, constitutionally, statutorily, and in decisional law. The Legislature and the courts have consistently viewed the zoning power as a special police power that must be expressly conferred by legislative mandate in order to be exercisable by local government. *See, e.g., Lusardi v. Curtis Point Property Owners Ass'n*, 86 *N.J.* 217, 226, 430 *A.*2d 881 (1981); *Mindel v. Township Council of Franklin Township*, 167 *N.J.Super.* 461, 466, 400 *A.*2d 1244 (Law Div.1979).

The delegation of the zoning power has been meticulously addressed by the Legislature. Thus, the current legislation, the Municipal Land Use Law, deals both comprehensively and in extraordinary detail with the local zoning power. *N.J.S.A.* 40:55D–1 to –112. Consistent with the selective attention given to municipal zoning power, *N.J.S.A.* 40:55D–20 expressly vests boards of adjustment with the exclusive authority to act in making zoning decisions about property within their boundaries: "Any power expressly authorized by this act to be exercised by ... [a] board of adjustment shall not be exercised by any other body, except as provided in this act." *N.J.S.A.* 40:55D–20. The exclusive authority expressly vested in a local board of adjustment encompasses the power to grant variances. That authority is itself a special and distinctive aspect of the local zoning powers.

A property owner cannot use his or her property in a manner not authorized by the zoning ordinance unless it qualifies for a

variance. That zoning power is an extremely important and sensitive element of municipal power, one that the Legislature has recognized as being singularly within the expertise of local boards of adjustment. Indeed, boards of adjustment, "because of their peculiar knowledge of local conditions, must be allowed wide latitude in the exercise of delegated discretion." *Kramer v. Board of Adjustment, Sea Girt,* 45 *N.J.* 268, 296, 212 *A.*2d 153 (1965). *N.J.S.A.* 40:55D–70(c) gives the board of adjustment the power to grant undue hardship variances or to grant a variance where the purposes of the zoning act would be advanced and "the benefits of the deviation would substantially outweigh any detriment." The power is highly discretionary and the decision-making process must be sensitive and informed. *See, e.g., Kaufmann v. Planning Bd. for Warren Township,* 110 *N.J.* 551, 558, 566, 542 *A.*2d 457 (1988) (land-use decision trusted to sound discretion of municipal boards, which are to be guided by positive and negative criteria of enabling statutes; Legislature intended to vest larger amount of discretion with local boards in allowing them to grant "c" variances). Or, as in the case at hand, a property owner may look to *N.J.S.A.* 40:55D–70(d), which gives the board of adjustment the power to grant variances for "special reasons." That also entails highly discretionary, specialized, and sensitive decision-making. *See, e.g., Medici v. BPR Co.,* 107 *N.J.* 1, 20, 526 *A.*2d 109 (1987) ("boards of adjustment possess special competence to decide use-variance applications").

Thus, the standards governing variances suggest that those were not contemplated by the Legislature to be in the nature of "permits" or "licenses" as those terms were used in statutes relating to general municipal supervisory powers over property. The authority to grant a "d" variance, as in this case, is delegated by the Legislature to the local board of adjustment of the municipality. *See ibid.* (Legislature has increasingly shifted authority to local boards to effectuate MLUL, and now allows boards to *grant,* not simply recommend, use variances). Nowhere does the statute vest such power in the board of an

adjacent municipality that has agreed on a scheme to divide up the assessment and collection of taxes from border-bisected properties.

■ Other considerations confirm this conclusion. The Legislature usually acts with great specificity in authorizing cooperative action between municipalities. Shared or transferred municipal authority must be specifically authorized. *N.J.S.A.* 40:55D–77. For instance, two or more municipalities may enter into a contract with another municipality having waterworks to obtain a supply of water. *N.J.S.A.* 40:62–49; *see Whelan v. N.J. Power & Light Co.,* 45 *N.J.* 237, 212 *A.*2d 136 (1965). Municipalities may also contract with one another to provide for sewage and garbage disposal. *N.J.S.A.* 40:63–68; *see Borough of W. Caldwell v. Borough of Caldwell,* 26 *N.J.* 9, 138 *A.*2d 402 (1958); *Freehold Borough v. Freehold Township,* 193 *N.J.Super.* 724, 475 *A.*2d 691 (App.Div.1984). These statutory requirements to delegate the provision of various municipal services explicitly and by contract impel the conclusion that it takes more than a joint resolution concerning tax assessment for a municipality to surrender its zoning authority.

In this case, we do not find the specific authority delegated by the Legislature we have come to expect in other contexts in order to find such a surrender; we decline to find one by implication here, particularly where there is an alternate statutory methodology available to those municipalities wishing to transfer or share their zoning power. Article 10 of the MLUL, *N.J.S.A.* 40:55D–77 to –88, delineates the ability of a municipality to enter into a joint agreement with another municipality to administer jointly "any or all of the powers conferred upon each of the municipalities ... pursuant to this act."

A determination in this case prohibiting Hazlet from exercising its zoning authority directly over Ferraro's property in Holmdel would not be an untoward result unfair to the property owner. Rather, it would mean that Ferraro would have to deal with two municipal authorities. Each presumably would

act in good faith in entertaining his application for the proper use, a permit from Hazlet and a variance from Holmdel. Although we have not been confronted in this appeal with the underlying merits of such application, a unique characteristic of the property is that it is subject to the jurisdiction of both Hazlet and Holmdel. Without a cooperative response from both municipalities, the property may not be susceptible to development. This fact may bear on the determination of whether a special reason exists under *N.J.S.A.* 40:55D–70(d), militating in favor of a variance. *See Medici v. BPR, supra,* 107 *N.J.* at 17 n. 9, 526 *A.*2d 109; *AMG Assocs. v. Township of Springfield,* 65 *N.J.* 101, 111–12, 319 *A.*2d 705 (1974) (municipality may not deprive owner of "reasonable utilization." of property split by zoning district line).

It appears from its resolution denying the variance application that the Holmdel board of adjustment was mindful of the zoning status of the property under the Hazlet ordinance. We have no way of knowing whether its attention to this aspect of the variance application was sufficient. In general we have recognized the importance of regional, extra-municipal considerations in reaching local zoning and planning decisions. *See Duffcon Concrete Products v. Borough of Cresskill,* 1 *N.J.* 509, 513, 64 *A.*2d 347 (1949) (determination of the most appropriate use of a particular property requires consideration of "the nature of the entire region in which the municipality is located and the use to which the land in that region has been or may be put most advantageously."). As long ago as 1930, the Legislature announced that municipal planning should give attention to "neighboring territory" and the surrounding "environs." *N.J.S.A.* 40:55–10 (*R.S.*); *see Borough of Cresskill v. Borough of Dumont,* 15 *N.J.* 238, 248, 104 *A.*2d 441 (1954).

Such considerations take on added significance in this case because the proposed use is permitted in the adjoining municipality of Hazlet. The fact that Hazlet allows the use may suggest that the property in Holmdel is uniquely suited for the proposed use. *See Kohl v. Fair Lawn,* 50 *N.J.* 268, 234 *A.*2d

385 (1967). In exercising its own zoning responsibilities, Holmdel is obligated to give significant weight to the zoning ordinance and plan of the adjacent municipality, Hazlet, as well as to the character and uses of surrounding property in both Hazlet and Holmdel.

We conclude, therefore, that Holmdel retains the power to zone all lands within its borders. However, we remand the cause to its board of adjustment for further proceedings consistent with this opinion.

*For reversal and remandment* Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For affirmance*—None.